**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

CHRISTINE CONROY, *et al.*,
    *Plaintiffs*,

v.

No. 3:14-cv-01180 (JAM)

DAVID A. CARON, *et al.*,
    *Defendants*.

**RULING RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On a summer day in August 2012, two Glastonbury police officers were investigating an anonymous tip that a high school student was engaged in drug dealing. In the course of their investigation, the officers entered the empty attached garage of the Conroy family residence. The police did not have permission or a warrant. They claim to have entered the garage in order to knock on a door inside the garage that led to the interior of the house. The officers' entry into the garage set in motion a chain of events that included the forcible arrest of the student, the issuance of a search warrant, a subsequent search of the house, and the later arrests of several members of the family, mostly on charges that were later dropped.

Following these events, Christine Conroy and three of her children filed this federal lawsuit against the Town of Glastonbury and a number of individual officers. Defendants have moved for summary judgment on all counts. I conclude that triable issues of fact remain for the core claims in this case. Genuine fact issues remain about whether several officers violated the Fourth Amendment and whether they are entitled at this time to qualified immunity. Genuine fact issues also remain as to plaintiffs' state law tort claims and state constitutional claims. On the other hand, I will grant summary judgment for defendants on plaintiffs' Fourteenth and Eighth Amendment claims, their *Monell* claim against the Town of Glastonbury, their official-

1

capacity claims, and their claims against various peripheral defendants in this case.

BACKGROUND

In light of the standards governing defendants' motion for summary judgment, the following facts are set forth on the basis of the parties' submissions and as viewed in the light most favorable to plaintiffs. Plaintiff Christine Conroy lives in Glastonbury, Connecticut, with her three children, Lauren, Martin, and minor P.C.—all plaintiffs in this case. In August 2012, when Martin was 17 years old, defendant David Goncalves (a Glastonbury police officer who was acting in his role as part of the Eastern Central Narcotics Task Force) was investigating Martin, because Martin was suspected of dealing drugs to other high school students. The investigation led to two encounters with the Conroy family at their residence, the first occurring on August 22, 2012. The August 22 encounter prompted the issuance of a search warrant, which police executed on September 5, 2012. That search, in turn, prompted criminal charges against several members of the family. Because plaintiffs allege multiple violations of their state and federal constitutional rights based on the events of August and September 2012, it is necessary to describe these events in some detail.

Around noon on August 22, 2012, Goncalves was surveilling plaintiffs' home. He contends that he was acting on two anonymous tips that he had received regarding possible drug sales occurring at the house. From his vantage point somewhere off plaintiffs' property, he could see that there was a three-bay garage attached to the Conroy home. He allegedly observed three young people hanging out inside the garage; he claims he could see inside the garage through the open middle garage door.

Goncalves then called defendant Michael Furlong, a fellow Glastonbury police officer, to assist him in his investigation. Goncalves left plaintiffs' neighborhood and met Furlong at the

2

Manchester fire station. The two officers then returned and parked their cars in front of the Conroy home. They decided to approach the house for further investigation. Although the Conroy house has a front door, they bypassed the front door, walking "up and around" to the garage area instead. Doc. #66-8 at 12.

The officers entered the garage through the middle garage door. Although the parties agree that the middle garage door was open in part and that the other two garage doors on either side of the middle door were fully closed, they dispute how much the middle garage door was open. Defendants claim that it was open at least halfway, and Goncalves testified that he was able to walk under the open door "without doing anything more than lowering [his] head." Doc. #66-7 at 6. In contrast, Christine Conroy testified that when she stopped by the house to drop off 11-year-old P.C. about an hour before the officers arrived, she observed the middle garage door much closer to the ground. *See* Doc. #75-5 at 9–10 (explaining that when Christine pulled up in the driveway, the middle garage door was open to "cat length," and that she then watched P.C., who was just over four feet in height, partially lift the garage door, stoop to get inside, and pull the door down behind him); Doc. #75-23 at 10 (P.C. entered house around 11:20 am and pulled garage door down to "cat height" once he was inside).

When Goncalves and Furlong entered the garage, there was no one inside. They saw a table, chairs, and several beer cans. They walked towards a door that was at the top of several steps inside the garage and that connected the garage to the inside of the Conroy home. As Goncalves stood on the steps leading up to the internal door, he looked on a shelf near the door and spotted a multi-colored pipe. Upon closer inspection, he noticed burnt marijuana residue on the inside of the bowl. Goncalves showed the pipe to Furlong.

Furlong then knocked on the door leading to the interior of the house and announced the presence of police. After a few minutes, a young man, who was not a resident of the house, opened the door. Goncalves and Furlong asked him to call a resident of the house to the door.

Lauren Conroy, who was 20 years old at the time, appeared at the door and then entered the garage. The officers asked to speak to "the blonde kid," apparently referring to Lauren's brother Martin. Lauren asked if the officers had a warrant and demanded that the officers leave the garage. The officers refused to leave, stating that they did not need a warrant, and they insisted that Lauren produce Martin.

Lauren went upstairs, where Martin was sleeping. Martin did not want to come down, but Lauren pleaded with him until he came downstairs and appeared at the door to the garage, having just been woken up and wearing only his boxer shorts.

The officers ordered Martin, Lauren, and their several friends into the garage. One friend, J.L., remained inside the door to the residence and began recording the encounter on his cell phone.[1] The officers ordered the group to sit down on the chairs in the garage. Martin remained standing and did not sit down with his friends and sister, though he disputes that he was ever asked to sit. Doc. #75-8 at 14. Both Martin and Lauren asked to see a warrant for the police entering the garage.

Goncalves threatened Martin and Lauren to turn over their marijuana or the police would enter the home. Martin politely responded that the police could not enter the home without a search warrant, and he asked the officers to leave. He reminded the officers that he was under 18 years old and that his mother was not home. At this, Goncalves "got into [Martin's] face." *Id*. at

---

[1] Any video taken by J.L. is not a part of the record in this case. Another friend, S.M., also claims that he videotaped part of the encounter in the garage, but that Geddes took his phone afterwards and deleted the video. This allegation was later investigated by defendant Lieutenant Bisi, as described *infra*.

7. Goncalves and Martin yelled at each other, and at one point, Martin told the officers to "[g]et the fuck out of my house." *Id.* at 8. Defendant Matthew Geddes, a third officer, arrived on scene around this time, while Goncalves and Martin were arguing.

Suddenly and without warning, Goncalves kicked Martin's legs out from under him as Martin was standing on the steps to the interior door. Martin was swept up and fell backwards, slamming the back of his head on the concrete garage floor. While he lay on the floor of the garage, Goncalves and Furlong hit, kicked, and kneed Martin. *Id.* at 15–17; Doc. #66-19 at 8–9, 11, 19. Geddes threatened to use his taser on Martin. Lauren ran over to intervene but was told she would be tased if she did not back up and sit down.

Martin was handcuffed and brought to his feet. He was "crying" and "screaming," yelling to the officers that he needed medical attention. Doc. #75-8 at 21–22. The officers placed Martin in the back of a police car and returned to the garage to address the rest of the group. Martin was eventually taken to the Glastonbury Police Department headquarters. He claims to have suffered a concussion as well as scrapes and cuts from the encounter.

Martin was issued an infraction for possession of alcohol by a minor, and a juvenile summons for possession of less than half an ounce of marijuana, possession of drug paraphernalia, disorderly conduct, and interfering. Lauren and her friends were issued infractions for possession of less than half an ounce of marijuana, possession of drug paraphernalia, and possession of alcohol by a minor.

On August 28, 2012, Goncalves (along with a fellow member of the Eastern Central Narcotics Task Force who is not a defendant in this case) applied for a warrant to search plaintiffs' residence for drugs and paraphernalia. The search warrant was supported by an affidavit from Goncalves relating the events of August 22. The affidavit stated that the door to

the garage had been open when the officers entered and that there were beer cans in the garage where the kids had been observed sitting, and also that Goncalves had located "in plain view" the multi-colored pipe containing marijuana residue. Doc. #75-13 at 2. The warrant was signed by a Connecticut state court judge on August 28, 2012. *Id.* at 7.

On September 5, 2012, Christine Conroy filed an in-person complaint against Goncalves with the Glastonbury Police Department about the injuries Martin suffered during the August 22 encounter. Defendant Lieutenant Bisi was assigned to investigate the complaint.

That same night at around 9:20 pm, members of the East Central Narcotics Task Force (some of whom were Glastonbury police officers) arrived to execute the search warrant at the Conroys' home. In the driveway, they encountered Christine, who was just arriving home; she let them in through the garage. The police entered the residence wearing ski masks, accompanied by dogs, and carrying rifles. 11-year-old P.C. was woken up and was crying in the kitchen during the search. Some officers went to the basement, where Martin and several friends were watching television, and ordered the group upstairs at gunpoint. Doc. #75-10 at 10.

Defendants contend that Martin became combative with the officers and did not comply with orders, although Martin denies this. Officers ultimately knocked Martin to the ground and handcuffed him, threatening again to tase him if he did not comply; Martin was "roughed up" in this process. Doc. #66-7 at 28; Doc. #75-10 at 12.

Police seized a number of items from the house during the September 5 search, including three glass pipes, a grinder, and a plastic container, each of which contained marijuana residue; a bottle containing a white powder that turned out to be a (legal) workout supplement; several bottles of liquor, which were found in the garage and in one of the children's bedrooms; and a small amount of marijuana, some of which was found on J.L.'s person and some of which was

found in the house. In total, the amount of marijuana seized was approximately 3.4 grams, or less than one-eighth of an ounce.

Based on the items seized on September 5, all of the plaintiffs (including 11-year-old P.C.) were charged with possession of less than half an ounce of marijuana and possession of drug paraphernalia, and Lauren, Martin, and P.C. were charged with possession of alcohol by a minor. Doc. #75-16 at 5. In addition, Martin was charged with interfering with a search warrant. Doc. #75-17.

Goncalves also submitted an application for a warrant to arrest Christine for risk of injury to a minor. After the initial application was denied by the state's attorney, *see* Doc. #66-7 at 32, Goncalves revised it to charge Christine with delivering alcohol to a minor, hosting an underage drinking party, possession of less than half an ounce of marijuana, and possession of drug paraphernalia. Doc. #66-7 at 35; Doc. #75-18. The revised application was approved, and a warrant for Christine's arrest was issued. Christine reported to the police station to turn herself in on September 19. Although all charges against Christine were later dismissed by the prosecutor, her arrest was the subject of press releases by the police and of media coverage. Docs. #75-21, #75-22.

As a result of Christine's in-person complaint on September 5, which she had made prior to the execution of the search warrant at her house, defendant Lieutenant Bisi investigated the events of August 22, including the officers' entry into the garage, the force used against Martin, and an allegation that Geddes deleted a video of the encounter from S.M.'s cell phone. Bisi found that there was some merit to the complaint—namely, that Geddes had improperly seized and looked through S.M.'s phone, even though it was not clear whether he deleted any video—

but that the entry into the garage and the force used against Martin were both lawful and reasonable. Doc. #75-23 at 13–14.

Christine (on her own and P.C.'s behalf), Martin, and Lauren Conroy filed this federal lawsuit in August 2014. They bring a variety of state and federal claims against the Town of Glastonbury and eleven individual members of the Glastonbury Police Department: Chief David Caron, Donald Bisi, Michael Furlong, Cory Davis, James Kennedy, David Goncalves, Steven Moyer, Matthew Geddes, Michael Bachand, Bryan Verillo, and Brandon Ritchie. Plaintiffs claim under 42 U.S.C. § 1983 that various individual defendants violated their Fourth Amendment rights to be free from illegal search and seizure, excessive force, false arrest, and malicious prosecution. Plaintiffs also claim violations of the Fourteenth Amendment (equal protection and substantive due process), as well as the Eighth Amendment (deliberate indifference to medical needs). Further, plaintiffs claim that defendants Caron, Bisi, Furlong, Davis, and Kennedy are liable under § 1983 on a theory of supervisory liability, and that the Town of Glastonbury is liable under § 1983 because it had a policy or practice of allowing excessive force and other police misconduct. In addition to their federal constitutional claims, plaintiffs claim that defendants violated their rights under Article First, §§ 7 and 9, of the Connecticut Constitution. Finally, plaintiffs bring several state tort claims, including negligent and intentional infliction of emotional distress, and assault and battery.[2] Defendants have moved for summary judgment as to all claims.

---

[2] The amended complaint also included a state law malicious prosecution claim, but plaintiffs' counsel clarified at oral argument that plaintiffs are pursuing a malicious prosecution claim under the Fourth Amendment only.

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## A. *Fourth Amendment Claims*

Plaintiffs' core claims arise under the Fourth Amendment. The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A "search" in the context of the Fourth Amendment occurs when the police intrude upon a person's reasonable expectation of privacy or if the police otherwise trespass upon one's person, house, papers, or effects for the purpose of acquiring information. *See Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013); *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012). A "seizure" under the Fourth Amendment occurs

when the police intentionally terminate one's freedom of movement by means of physical force or by show of their official law enforcement authority. *See Brendlin v. California*, 551 U.S. 249, 254 (2007); *Russo v. City of Bridgeport*, 479 F.3d 196, 208 (2d Cir. 2007). Alternatively, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

Not every police violation of the Fourth Amendment justifies an award of money damages. That is because the doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (*per curiam*). In this manner, "[q]ualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Qualified immunity protects an officer from liability if "(1) his conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015); *see also Amore v. Novarro*, 624 F.3d 522, 529–30 (2d Cir. 2010). As the Supreme Court has explained, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). Thus, an officer is entitled to qualified immunity if, on the basis of the facts known to the officer when he engaged in the conduct at issue, "officers of reasonable competence could

disagree as to the lawfulness of such conduct." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010).[3]

The Second Circuit has noted that "[t]o determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). The law may be clearly established if "decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Ibid.* (internal quotation marks omitted). Although there need not be "a case directly on point," it must nonetheless be clear that "existing precedent [has] placed the . . . constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). *See also White v. Pauly*, 137 S. Ct. 548, 552 (2017) (denial of qualified immunity on excessive force claim was in error where court "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment," and instead relied on cases that "lay out excessive-force principles at only a general level.")

### 1. *Warrantless Entry to Garage on August 22, 2012*

Plaintiffs first allege that the entry by Goncalves and Furlong into the garage on August 22 constituted an unlawful search, and that the subsequent seizure of beer cans and the glass pipe constituted an unlawful seizure, in violation of the Fourth Amendment. Defendants move for summary judgment, arguing that the officers' entry into the garage was lawful (and that the

---

[3] Notwithstanding the use of similar terminology, the fact that an officer has been found to have acted "unreasonably" in a manner that violates the Fourth Amendment does not compel a corresponding conclusion that the officer has acted "objectively unreasonably" and therefore outside the scope of qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 204–06 (2001), *modified on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *Anderson v. Creighton*, 483 U.S. 635, 643–44 (1987); *see also* John C. Jeffries, Jr., *The Liability Rule for Constitutional Torts*, 99 Va. L. Rev. 207, 264–65 (2013).

subsequent seizures were reasonable under the plain view exception), or in the alternative, that the officers are protected by qualified immunity.

It is well established that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court for E. Dist. of Mich.*, 407 U.S. 297, 313 (1972). Indeed, "[t]he core premise underlying the Fourth Amendment is that warrantless searches of a home are presumptively unreasonable." *Harris v. O'Hare*, 770 F.3d 224, 231 (2d Cir. 2014) (citing, *inter alia*, *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011)). If police officers have neither a warrant nor valid consent, they need no less than both probable cause and exigent circumstances in order to lawfully enter or remain in a person's home. *Harris*, 770 F.3d at 231 (citing *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (*per curiam*)); *Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014).

The protections afforded by the Fourth Amendment extend also to a home's curtilage, or the "area immediately surrounding and associated with the home." *Jardines*, 133 S. Ct. at 1414. The curtilage is considered "part of the home itself for Fourth Amendment purposes." *Ibid.* (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

Defendants concede that officers had neither a warrant nor plaintiffs' explicit consent to enter the garage on August 22. They are also not claiming that exigent circumstances justified the officers' entry into the garage. Rather, defendants argue that (1) there was no entry into the home because plaintiffs' garage is not part of the home, and (2) the officers had implied consent to approach the door inside the garage that connects the garage to the interior of the home, as part of a lawful "knock and talk." I do not agree.

Many courts have ruled that garages (particularly those attached to a home) are part of the home or part of the curtilage and thus fully entitled to Fourth Amendment protection. *See,*

*e.g.*, *United States v. Dunn*, 480 U.S. 294, 307–08 (1987) ("the general rule is that the curtilage includes all outbuildings used in connection with a residence, such as garages, sheds, [and] barns . . . connected with and in close vicinity of the residence"); *Taylor v. United States*, 286 U.S. 1, 5–6 (1932) (holding that warrantless search of garage adjacent to dwelling violated the Fourth Amendment); *Vinson v. Vermilion Cty., Ill.*, 776 F.3d 924, 929 (7th Cir. 2015) (noting that "[t]he Vinsons' attached garage and the areas immediately surrounding their home and garage fit comfortably within the scope of the Fourth Amendment's protections of the home"); *United States v. Oaxaca*, 233 F.3d 1154, 1157–58 (9th Cir. 2000) (noting that "[i]n the face of clearly contrary law, the Government asserts that the agents were not required to obtain an arrest warrant because Oaxaca's attached garage is not part of his home," and holding that "a person's garage is as much a part of his castle as the rest of his home"); *Mallory v. City of Riverside*, 35 F. Supp. 3d 910, 928–29 (S.D. Ohio 2014) (finding attached garage to be curtilage and thus protected by the Fourth Amendment, in part because garage "is linked to the home physically and psychologically"); *United States v. Powell*, 2012 WL 12897985, at *1 (S.D.W. Va. 2012) ("Courts have long considered attached garages to be part of the home"), *aff'd on other grounds*, 519 F. App'x 826 (4th Cir. 2013).

I am persuaded by the rationale and conclusion of the cases above; it is abundantly clear to me that plaintiffs' garage is protected by the Fourth Amendment. The garage in this case is most naturally characterized as part of the home itself, especially given the evidence that the space was furnished with a sofa, chairs, and tables, and that Martin and his friends often spent time there. Docs. #75-3 at 29; #66-11 at 4–6, #75-8 at 9–10. *See also* Doc. #75-8 at 10 (Martin's testimony that "the garage is part of my home"); Doc. #66-10 at 13 (Furlong's testimony that "I think that's kind of a standard response when police are in your home").

Although the Second Circuit has apparently not issued a ruling concerning whether an attached garage is part of the home for purposes of the Fourth Amendment, there is no reason to think that it would not so conclude (especially in light of the Supreme Court's decision in *Dunn*). Indeed, the Second Circuit has ruled that the law was "clearly established [as of 2006] that a fenced-in side or backyard directly abutting a single-family house constitutes curtilage" subject to protections of the Fourth Amendment. *Harris*, 770 F.3d at 240. If a fenced-in yard warrants the protection of the Fourth Amendment, there can be no doubt that an attached garage equally does so.[4]

Defendants rely on *United States v. Titemore*, 437 F.3d 251 (2d Cir. 2006), a case in which the Second Circuit concluded that the police did not violate the Fourth Amendment when they crossed the lawn of a home, ascended to a porch deck, and knocked at a sliding-glass door entrance. The court of appeals reasoned that "while the sliding-glass door and porch are connected to the house and, in this respect, would tend to support a finding that they are within the curtilage of the home, they also constitute part of a principal entranceway, which has associated with it a diminished expectation of privacy," and that "the porch area and lawn were not completely enclosed," and also that "the sliding-glass door was in fact a primary entrance visible to and used by the public." *Id.* at 259.

The *Titemore* decision is obviously distinguishable from the facts before me here. Unlike the open porch area in *Titemore*, there is nothing to indicate that the inside of the Conroy's garage was a welcome lobby for visitors from the public. The fact that the middle garage door was partly open was not an invitation to the public to enter the otherwise closed garage. No objectively reasonable law enforcement officer would have thought so. *See, e.g., Oaxaca*, 233

_____

[4] Counsel for defendants conceded at oral argument that if the garage door had been fully closed, an officer would be prohibited from entering the garage as a matter of clearly established Fourth Amendment law.

F.3d at 1157 (Ninth Circuit decision from 2000 rejecting argument that "the agents did not need a warrant [to enter a garage] because Oaxaca had left his door open" and concluding that the Fourth Amendment does not "protect only hermetically sealed residences" and that "the argument that anyone who is visible from the street implicitly invites the Government to enter his home not only deeply offends common sense, but flies in the face of well-established law").

Moreover, *Titemore* considered solely whether the officers intruded upon a reasonable expectation of privacy. The law of the Fourth Amendment, however, evolved from the date of the *Titemore* decision in 2006 and the date of the events at issue in this case in August 2012. In January 2012, the Supreme Court decided that the Fourth Amendment may be violated not only when law enforcement officers intrude upon a reasonable expectation of privacy but also when they otherwise trespass upon one's person, home, papers, or effects. *See Jones*, 565 U.S. at 408 n.5; *see also Jardines*, 133 S. Ct. at 1414 (Fourth Amendment "search" occurred when police officers entered front porch of home; "[t]he officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself," and "they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner"); *United States v. Sweeney*, 821 F.3d 893, 899 (7th Cir. 2016) (discussing broadening of Fourth Amendment "search" standard).

In short, in view of the facts as presented in the light most favorable to plaintiffs (including plaintiffs' version that the garage door was mostly closed to "cat length"), a genuine fact issue remains as to whether Goncalves and Furlong violated the Fourth Amendment when they entered the Conroys' garage without a warrant, without consent, and without exigent circumstances. Moreover, their entry into the garage under these assumed circumstances violated

clearly established law, such that they are not entitled at this time to the protection of qualified immunity.[5]

### 2. Seizure of Evidence Inside Garage on August 22, 2012

Genuine fact issues likewise remain about the lawfulness of the officers' seizure of evidence including beer cans and the glass pipe inside the garage. If the unlawfulness of the entry into the garage is assumed, these seizures cannot be justified under the plain view exception to the warrant requirement. It was clearly established law at the time that the officers acted that the police may not seize evidence pursuant to the plain view exception unless three requirements are met: (1) the police have a lawful right of access to the evidence, (2) the evidence is in plain view, and (3) the criminality of the evidence is immediately apparent. *See Horton v. California*, 496 U.S. 128, 136 (1990); *United States v. Galpin*, 720 F.3d 436, 451 (2d Cir. 2013). Because there is a genuine issue of material fact whether the police had a lawful right to enter the garage, there is also a genuine issue of material fact whether they had a lawful right of access to the evidence inside the garage. And the same reasons justify denial of qualified immunity for their seizure of evidence inside the garage. Accordingly, I will deny summary

---

[5] The officers' entry into the garage on August 22 led to the seizure of evidence inside the garage and to Martin's forcible seizure and arrest that day, and then to the issuance of a search warrant, which in turn led to a search of plaintiffs' home on September 5 and several more arrests. Plaintiffs bring distinct constitutional claims with respect to these subsequent events, and I will address them in the discussion below. But before doing so I note that plaintiffs may recover for any injuries that were proximately caused by the unlawful entry into the Conroys' garage, whether or not those subsequent injuries arose from independent constitutional violations. *See County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1548 (2017) ("[P]laintiffs can—subject to qualified immunity—generally recover damages that are proximately caused by any Fourth Amendment violation."); *see also Townes v. City of New York*, 176 F.3d 138, 145–48 (2d Cir. 1999) (rejecting application of the fruit-of-the-poisonous-tree doctrine to § 1983 civil actions but applying rule of proximate causation to allow for plaintiff's recovery of damages proximately caused by initial illegality and without independent and intervening cause). Defendants "may be liable for consequences caused by reasonably foreseeable intervening forces, [and] the chain of causation need not be considered broken if [defendants] deceived the subsequent decision maker . . . or could reasonably foresee that [their] misconduct [would] contribute to an 'independent' decision that results in a deprivation of liberty." *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007) (citing *Townes*, 176 F.3d at 147, and *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000) (some internal quotation marks omitted)). Accordingly, to the extent that later events were proximately caused by the officers' unlawful entry into the family garage, the independent lawfulness of these later actions may be of only academic interest for purposes of plaintiffs' right to an award of money damages.

judgment as to plaintiffs' claims of illegal search and seizure of evidence against Goncalves and Furlong stemming from their entry into the garage on August 22, 2012.

### 3. Excessive Force Against Martin Conroy on August 22, 2012

Plaintiffs next allege that Goncalves, Furlong, and Geddes violated Martin Conroy's right under the Fourth Amendment to be free from excessive force when officers knocked Martin to the garage floor and struck him during the August 22 encounter. Because the Fourth Amendment protects against unreasonable seizures, it has long been recognized that the Fourth Amendment is violated when the police use excessive force against a free person for the purpose of arresting or restraining his freedom of movement. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386 (1989). The factors to be considered when evaluating an excessive force claim include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. As the Supreme Court has explained, whether law enforcement officers' use of force is "excessive" must be judged by "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (internal quotation marks omitted). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397.

Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97; *see also Brown v. City of New York*, 798 F.3d 94, 100–03 (2d Cir. 2015) (discussing Fourth Amendment standard for excessive force claims).

The relevant facts as viewed in the light most favorable to plaintiffs are as follows: the police entered plaintiffs' garage unlawfully and insisted that Lauren go upstairs, wake Martin up, and make him come down to the garage. Martin came downstairs "in [his] boxer shorts, still half asleep." Doc. #75-8 at 6. He denies that the officers instructed him to sit down when he entered the garage. *Id.* at 14. Martin politely and respectfully asked the officers to leave the property, because they did not have a warrant. *Id.* at 7. After Goncalves "got into [his] face," Martin responded with, "Get the fuck out of my house. You don't have a warrant. You've got to leave." *Id.* at 8–9. In response, Goncalves "swooped [Martin] up in one swift maneuver," throwing him to the concrete garage floor. *Id.* at 9. Then either one or two officers began to kick Martin in the head and to knee him. *Id.* at 9, 16–17, 19–20.[6] Lauren identified Furlong and Goncalves as the officers that were "on top of" her brother. Doc. #75-6 at 13. The parties dispute the extent of Martin's injuries, but Martin claims to have suffered a concussion, as well as "scrapes all over" his body. Doc. #75-8 at 21.

On the basis of plaintiffs' version of events, I conclude that there is a genuine issue of material fact with respect to whether Goncalves, Furlong, and Geddes violated Martin's right to be free from excessive force. Although the officers contend that Martin was restrained after becoming combative and disobeying officers' directions, plaintiffs have adduced facts to suggest

---

[6] Martin's account is largely corroborated by S.M.'s deposition testimony. *See* Doc. #66-19 at 8–9 ("He's like, you guys got to go. You've got no warrant. You have no warrant to be here. Just get the fuck out of here. And they're like, He's resisting! He's resisting! . . . And that's when they grab him and fucking throw him on the ground and go like this, to the point where he's like this, like Stop. They're like, kneeing him in the back and shoving his face in the ground."); *id.* at 11 ("So when they grabbed him, they threw him down. It looked like he hit his head hard."); *id.* at 19 ("they were kneeing him and shit").

that Martin was thrown to the ground by Goncalves and attacked by Goncalves and Furlong simply for verbally insisting that the officers leave his home. A reasonable jury could "find that [Goncalves and Furlong] gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124 (2d Cir. 2004).

Although Geddes's role in the use of force is less clear, plaintiffs have adduced evidence sufficient to allow a jury to infer that Geddes threatened to use his taser and could have intervened to prevent the assault but failed to do so. *See Gonzalez v. Waterbury Police Dep't*, 199 F. Supp. 3d 616, 622 (D. Conn. 2016) ("Even if the evidence is insufficient to establish that a particular defendant directly participated in the use of excessive force, a plaintiff may still prove personal liability under section 1983 by showing that the defendants permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights," and "[a] plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene.").

I further conclude that Goncalves, Furlong, and Geddes are not entitled to qualified immunity on Martin's excessive force claim. Certainly there is a clearly established right not to be thrown to the floor and physically struck for verbally insisting (even if quite vehemently) that the police leave one's home when the police have unlawfully entered and refuse to leave. Under the Supreme Court's decision in *Graham*, courts determine whether force is reasonable by considering "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Here, viewing the facts in the light most favorable to Martin, those facts show that Martin was suspected of drug dealing at his high

school based on two anonymous tips, posed no immediate threat, and did not actively resist or attempt to evade arrest—in which case no reasonable officer could conclude under *Graham* that it was lawful to take Martin to the ground and strike him repeatedly. The cases cited by defendants do not contain clearly established law to the contrary. Indeed, defendants conceded at oral argument that if I were to find that the officers' presence in the garage was unlawful, there would be a triable issue of fact as to the excessive force claim.

### 4. Search of Home on September 5, 2012

Plaintiffs also claim that defendants violated their Fourth Amendment right to be free from illegal search and seizure when officers entered and searched plaintiffs' home on September 5. Defendants argue that the September 5 search was conducted pursuant to a valid, signed search warrant, and that the officers cannot be liable because they relied in good faith on the issuing judge's finding of probable cause. Although plaintiffs concede that the September 5 search was indeed conducted pursuant to a signed warrant, they contend that Goncalves improperly procured the warrant by omitting and falsifying facts in the warrant application.

If a search has been conducted pursuant to a court-authorized warrant, "great deference" is due to the issuing judge's determination that there is probable cause to search a premises. *United States v. Leon*, 468 U.S. 897, 914 (1984). "Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a criminal defendant who seeks to suppress the fruits of a search warrant must show that (1) the affiant knowingly and intentionally, or with a reckless disregard for the truth, made false statements or omissions in his application

for a warrant, and (2) such statements or omissions were necessary to the finding of probable cause. *Id.* at 155–56; *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005). The *Franks* standard likewise "applies in civil cases, like this one, brought pursuant to § 1983, in which a plaintiff seeks to challenge a warranted search as unlawful." *Calderon v. City of New York*, 2015 WL 2079405, at *5 (S.D.N.Y. 2015); *see also McColley v. Cty. of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014) (same).

The search warrant application submitted by Goncalves heavily relied on evidence from the August 22 garage search, as well as on the anonymous tips that Goncalves had allegedly received from two neighbors. Plaintiffs contend that Goncalves knowingly misled the state court judge who issued the search warrant by omitting and falsifying facts about the events of August 22, so as to portray the officers' actions as lawful when in fact they were unlawful. For example, the application states that officers approached the "open garage door of the residence." Doc. #75-13 at 2. The application also fails to mention that Martin and Lauren repeatedly asked the officers to leave the property. I find that plaintiffs have offered sufficient evidence to give rise to a genuine issue of material fact as to whether Goncalves intentionally or recklessly made false statements or omissions in the search warrant application. *See United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir.) (good faith exception not applicable where officer included facts in warrant affidavit that were "almost calculated to mislead" such that "the issuing judge could not possibly make a valid assessment of the legality of the warrant that he was asked to issue"), *aff'd and amended*, 91 F.3d 331 (2d Cir. 1996) (*per curiam*).

I also find that there is a genuine issue of material fact as to whether such statements or omissions were necessary to the magistrate's finding of probable cause. To determine whether a misrepresentation or omission was necessary to the finding of probable cause, courts apply the

"corrected affidavit" approach, which involves looking "to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause[.]" *McColley*, 740 F.3d at 823 (internal quotation marks omitted). While "the materiality of a misrepresentation or an omission in this context is a mixed question of law and fact[,] . . . the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases." *Ibid.*

Here the issuing state court judge likely relied heavily on the account of the August 22 search. Viewing the facts in the light most favorable to plaintiffs, a "corrected" affidavit would have revealed facts exposing the unlawfulness of the August 22 search, which may well have dissuaded the state court judge from issuing a warrant. Apart from the evidence from the August 22 search, the only other evidence contained in the warrant application consisted of the two anonymous, uncorroborated tips from neighbors. It is certainly not clear that the anonymous tips on their own would have supported a probable cause determination. *See ibid.* (explaining that "when making a determination of whether probable cause exists to support the issuance of a search warrant when the facts offered are based upon information from a confidential informant, this Court examines the totality of the circumstances," which includes considerations of "an informant's veracity, reliability, and basis of knowledge, and the extent to which an informant's statements . . . are independently corroborated").

Defendants argue that the officers relied on the judge's probable cause determination in good faith and are therefore shielded from liability. *See* Doc. #66-1 at 12 (citing *Leon*, 468 U.S. 897). But if it was Goncalves who intentionally or recklessly misled the magistrate into issuing the search warrant, he cannot escape liability by later claiming to have relied on the state court

judge's probable cause finding. *See Reilly*, 76 F.3d at 1280 ("the good faith exception does not apply when officers do not provide an issuing judge with details about their conduct during a pre-warrant search").

Nor is Goncalves entitled to qualified immunity: "Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a material omission is intended to enhance the contents of the affidavit as support for a conclusion of probable cause, . . . the shield of qualified immunity is lost[.]" *Golino*, 950 F.2d at 871. Accordingly, I will deny defendants' motion for summary judgment as to Goncalves on plaintiffs' claim of unlawful search on September 5.

There is some evidence to suggest that Moyer, Bachand, and Verillo were present for the September 5 search. It is not clear to me whether plaintiffs bring their unlawful search claim against these defendants in addition to Goncalves. To the extent that plaintiffs' claim is brought against Moyer, Bachand, and Verillo, I find for defendants. Unlike Goncalves, these officers could well have relied on the state court judge's probable cause finding in good faith, as there is no evidence to suggest that they were involved in the events of August 22 or in the application for a search warrant.

### 5. *False Arrest and Malicious Prosecution Claims*

Plaintiffs assert Fourth Amendment claims for false arrest and malicious prosecution arising from Martin Conroy's arrest on August 22, from Martin Conroy's arrest on September 5, and from Christine Conroy's arrest pursuant to a warrant on September 19. Defendants move for summary judgment, arguing primarily that all of these arrests were supported by probable cause.

"Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are substantially

the same as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (internal quotation marks and citations omitted). A "false arrest" is "the unlawful restraint by one person of the physical liberty of another." *Edelman v. Page*, 2015 WL 1395893, at *11 (D. Conn. 2015). To prevail on a claim of false arrest, a plaintiff must show that "(1) the defendant intentionally arrested him [or her,] or had him [or her] arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent to the arrest; and (4) the arrest was not supported by probable cause." *Sharnick v. D'Archangelo*, 935 F. Supp. 2d 436, 443 (D. Conn. 2013) (internal quotation marks and citation omitted).

Similarly, to prevail on a claim of malicious prosecution, a plaintiff must prove that he or she was subject to a Fourth Amendment seizure and also that "(1) the defendant initiated or continued criminal proceedings against the plaintiff; (2) the criminal proceeding terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice." *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (*per curiam*) (internal quotation marks and citation omitted); *see also Simms v. Seaman*, 308 Conn. 523, 542 (2013) (malice involves acting "primarily for a purpose other than that of bringing an offender to justice" (internal quotation marks and citation omitted)).

The existence of probable cause is a complete defense to claims for false arrest and malicious prosecution under § 1983. *See Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014); *Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010). "An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed . . . a crime." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013).

In addition, an officer is entitled to qualified immunity from a claim for false arrest or malicious prosecution if he or she had at least *arguable* probable cause to have made the arrest or initiated and maintained a prosecution. *See id.* at 89 n.3. "A police officer has arguable probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (internal quotation marks and citation omitted).

### a. *Martin Conroy's Arrest on August 22, 2012*

I will first consider whether Martin's arrest on August 22 was supported by arguable probable cause. Martin was arrested for interfering with an officer, in violation of Conn. Gen. Stat. § 53a-167a, and for disorderly conduct, in violation of Conn. Gen. Stat. § 53a-182.[7] As I have already discussed at length, the parties have offered very different accounts of Martin's actions leading up to his arrest, and there is a substantial question whether the officers were in the garage illegally. If Martin was merely verbally protesting the police's illegal entry into his home, it was not objectively reasonable for the officers to conclude that probable cause existed to arrest him for interfering with an officer or disorderly conduct. *See State v. Brocuglio*, 264 Conn. 778, 793–94 (2003) (recognizing "common-law privilege to challenge an unlawful entry into one's home . . . to the extent that a person's conduct does not rise to the level of a crime" such as assault); *Ruttkamp v. De Los Reyes*, 2012 WL 3596064, at *6 (D. Conn. 2012) ("Where the offending conduct is merely verbal, . . . the Connecticut Supreme Court has held that it does not constitute illegal interference to merely question [] a police officer's authority or protest [] his or

---

[7] Martin was also charged with possession of alcohol by a minor, possession of less than half an ounce of marijuana, and possession of drug paraphernalia, but the charges of disorderly conduct and interfering were the basis for his arrest. Lauren and the other young people who were present on August 22 were also charged with possession of alcohol, marijuana, and drug paraphernalia, but were not arrested.

her action.").[8] Because I conclude that genuine issues of material fact remain as to whether arguable probable cause existed to support Martin's arrest and prosecution for interfering with an officer and disorderly conduct, I will deny defendants' motion for summary judgment on the claims of false arrest and malicious prosecution that arise from this arrest. The false arrest claim will proceed against Goncalves, Furlong, and Geddes, all of whom appear to have been personally involved in Martin's arrest on August 22. The malicious prosecution claim will proceed against Goncalves.[9]

### b. Martin Conroy's Arrest on September 5, 2012

Similarly, genuine issues of material fact exist with respect to whether arguable probable cause supported Martin's arrest on September 5. Martin was escorted with his friends from the basement at gunpoint and was then handcuffed during the search of the home; he was ultimately charged with interference with a search, in violation of Conn. Gen. Stat. § 54-33d. Section 54-33d applies to "[a]ny person who forcibly assaults, resists, opposes, impedes, intimidates or interferes with any person authorized to serve or execute search warrants or to make searches and seizures while engaged in the performance of his duties with regard thereto or on account of the performance of such duties."

Defendants contend that Martin refused to comply with their verbal commands, ran from officers, and became combative with officers during the search, and thus that the officers acted

---

[8] Plaintiffs argue that defendants lacked probable cause to arrest Martin for breach of peace because the alleged conduct took place in his own home as opposed to in a public place. *See* Doc. #74 at 20. But Martin was arrested for disorderly conduct under Conn. Gen. Stat. § 53a-182, not breach of peace under Conn. Gen. Stat. § 53a-181. *See* Doc. #66-10 at 26. There is not a requirement that disorderly conduct must occur in a public place. *See State v. Duhan*, 194 Conn. 347, 358 (1984).

[9] Although defendants mostly focus on the question of arguable probable cause, they also contend that plaintiffs' malicious prosecution claims fail because "plaintiffs do not allege that defendants pressured or otherwise sought to induce the prosecutor to prosecute the plaintiffs," and because plaintiffs "proffer no evidence of malicious intent on the part of defendants." Doc. #66-1 at 25. Although plaintiffs have failed to respond to these arguments, I find that the record contains sufficient evidence on which a reasonable jury could find that Goncalves submitted knowing misstatements to the state's attorney's office and acted with malice towards plaintiffs.

reasonably in arresting him. But defendants' account is clearly contradicted by Martin's testimony that he complied with all of the officers' commands, did not resist, and did not run from the officers. Doc. #75-8 at 26–28. On Martin's version of the facts, it would not have been objectively reasonable for the officers to conclude that probable cause existed to arrest and prosecute Martin for interfering with a search. Therefore, I will deny defendants' motion for summary judgment on the claims of false arrest and malicious prosecution against Goncalves that arise from Martin's arrest on September 5.

### c. *Christine's Arrest on September 19, 2012*

Christine Conroy also brings claims of false arrest and malicious prosecution arising from her arrest on September 19, 2012, pursuant to an arrest warrant. Christine was charged with delivering alcohol to a minor, in violation of Conn. Gen. Stat. § 30-86(a)(2); hosting an underage drinking party, in violation of Conn. Gen. Stat. § 30-89a(a)(1); possession of less than half an ounce of marijuana, in violation of Conn. Gen. Stat. § 21a-279(c)(1); and possession of drug paraphernalia, in violation of Conn. Gen. Stat. § 21a-267(d). *See* Doc. #66-7 at 39.

Defendants argue that Christine's arrest was supported by probable cause (and arguable probable cause for purposes of qualified immunity), given that she was arrested pursuant to a signed warrant. "Ordinarily, an arrest . . . pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause." *Walczyk v. Rio*, 496 F.3d 139, 155–56 (2d Cir. 2006). But as with the search warrant context discussed above, the presumption of probable cause can be overcome under certain circumstances—for example, if the affiant intentionally or recklessly submitted false statements or omitted important information on the warrant application, and such statements or omissions were material to the magistrate's finding of probable cause.

I find that there are genuine issues of material fact as to whether Christine's arrest was supported by arguable probable cause. Most obviously, there is scant (if any) evidence to suggest that Christine gave or delivered alcohol to a minor in violation of Conn. Gen. Stat. § 30-86(a)(2),[10] permitted a minor to possess alcohol on her property in violation of § 30-89a(a)(1), or herself possessed marijuana or drug paraphernalia. No evidence in the record suggests that Christine was aware that any minors in her home possessed alcohol. At oral argument, defendants pointed only to Christine's statement that "all of the alcohol belonged to her," *see* Doc. #75-18 at 4, and to Christine's presence in the driveway when police arrived as evidence of probable cause for the alcohol-related charges. But Christine disputes that she ever said the alcohol belonged to her, *see* Doc. #75-5 at 23, and plaintiffs contend that Goncalves intentionally fabricated this statement. Whether I look at the original affidavit or the "corrected affidavit" (omitting Christine's allegedly inculpatory statement), the application does not contain information that amounts to arguable probable cause to arrest Christine.

Defendants rely on *Leon* to argue that the officers relied in good faith on the issuance of the arrest warrant, but *Leon* requires that an officer's reliance on a judge's probable-cause determination be "objectively reasonable" and acknowledges that "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922–23. Similarly, with respect to the qualified immunity defense, "where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, . . . the shield of immunity [will] be lost." *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986). Here, I find that the arrest warrant application plainly lacked indicia of

---

[10] Under Conn. Gen. Stat. § 30-86(a)(2), "[a]ny person who sells, ships, delivers or gives alcoholic liquor to a minor, by any means, including, but not limited to, the Internet or any other on-line computer network, except on the order of a practicing physician, shall be fined not more than three thousand five hundred dollars or imprisoned not more than eighteen months, or both."

probable cause to support the charges, such that no reasonable officer could have relied on it. I will therefore deny summary judgment on the claims of false arrest and malicious prosecution against Goncalves arising from Christine's September 19 arrest.

### B.  Other Constitutional Claims

#### 1.  Connecticut Constitution

Defendants move for summary judgment on plaintiffs' claims under Article First, §§ 7 and 9 of the Connecticut Constitution. In *Binette v. Sabo*, 442 Conn. 23 (1998), the Connecticut Supreme Court recognized a private constitutional right of action for violations of Article First, §§ 7 and 9. "*Binette* created a narrow cause of action for money damages under the Article First, §§ 7 and 9 of the Connecticut Constitution for illegal searches and seizures of private homes by police officers, a cause of action that is equivalent to the federal *Bivens* action under the Fourth Amendment to the United States Constitution." *Lopez v. Smiley*, 375 F. Supp. 2d 19, 23 (D. Conn. 2005).

Because I must view the facts in the light most favorable to plaintiffs, I do not agree with defendants' argument that "the facts alleged here do not rise to the level" of those facts found actionable in *Binette*. Doc. #66-1 at 30. The facts adduced by plaintiffs involve clear violations of plaintiffs' Fourth Amendment rights to be free from illegal search, false arrest, and excessive force. I will therefore deny defendants' motion for summary judgment on plaintiffs' state constitutional claims for the same reasons that I am denying summary judgment on plaintiffs' cognate claims under § 1983.

#### 2.  Fourteenth Amendment and Eighth Amendment

In addition to alleging violations of the Fourth Amendment, the complaint alleges that defendants violated plaintiffs' substantive due process and equal protection rights under the

Fourteenth Amendment, as well as Martin's Eighth Amendment rights. For the reasons explained below, defendants are entitled to summary judgment on these additional claims.

As to plaintiffs' substantive due process claim, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham*, 490 U.S. at 395). Counsel acknowledged at oral argument that plaintiffs' substantive due process claim rests on the same facts as the Fourth Amendment claims in the case. Because the Fourth Amendment provides a more explicit textual source of constitutional protection for plaintiffs' claims of illegal search and excessive force, I need not address these claims under a substantive due process analysis. *See Russo v. City of Bridgeport*, 479 F.3d 196, 209 (2d Cir. 2007).

The amended complaint alleges a Fourteenth Amendment equal protection claim as well. The Equal Protection Clause of the Fourteenth Amendment "requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Plaintiffs appear to have abandoned this claim, as they did not address it in their opposition brief or at oral argument. Nor does there appear to be any factual basis for a claim of disparate treatment. Accordingly, I will grant summary judgment for defendants on the equal protection claim.

I will similarly grant summary judgment for defendants on plaintiffs' Eighth Amendment claim. The Eighth Amendment applies to the punishment of convicted offenders and does not regulate pre-conviction interactions between the police and the public. *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

### C. *Monell Claim against Town of Glastonbury*

The complaint alleges a *Monell* claim of municipal liability under § 1983 against the

Town of Glastonbury. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). In order to hold a

municipality liable under § 1983, a plaintiff must establish that the municipality had a policy,

custom, or practice that was intended to violate or that was deliberately indifferent to

constitutional rights, and that this policy, custom, or practice actually caused the violation by

municipal actors of plaintiff's constitutional rights. *See, e.g.*, *Connick v. Thompson*, 563 US. 51,

60–61 (2011); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014). In other

words, a plaintiff must show a "direct causal link" between "an existing, unconstitutional

municipal policy, which policy can be attributed to a municipal policymaker," and the alleged

constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *City of Oklahoma v.

Turtle*, 471 U.S. 808, 823–24 (1985).

Plaintiffs claim that the Town had a practice of failing to adequately investigate

complaints of excessive force and false arrest, and of failing to discipline the officers responsible

for such violations. Doc. #74 at 24. But the only evidence that plaintiffs offer in support of this

claim is evidence about the investigation of the incidents at issue in this case, as well as evidence

of further misconduct by defendant Goncalves in 2014. Plaintiffs have not adduced any evidence

to show that a municipal policy, custom, or practice existed *prior* to the events at issue in this

case, much less any evidence of a "direct causal link" between any such policy and the alleged

constitutional violations. Accordingly, I will grant summary judgment to defendants on

plaintiffs' *Monell* claim.

### D.  Official Capacity Claims

Plaintiffs have named all of the individual defendants in both their individual and official capacities. Defendants seek summary judgment on all of the official capacity claims on the ground that such claims are redundant of plaintiffs' claims against the Town of Glastonbury. Doc. #66-1 at 4. "Official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," *Monell*, 436 U.S. at 690 n.55, and thus "[a]n official capacity suit against a public servant is treated as one against the governmental entity itself." *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007). As a result, "district courts within the Second Circuit consistently dismiss as duplicative claims asserted against officials in their official capacities where the plaintiff has named the municipal entity as a defendant." *Demski v. Town of Enfield*, 2015 WL 4478401, at *3 (D. Conn. 2015). Accordingly, I will grant summary judgment to defendants on all of plaintiffs' official capacity claims.

### E.  Claims Against Peripheral Defendants

#### 1.  Supervisory liability claims

The complaint further alleges claims against defendants Caron, Bisi, Furlong, Davis, and Kennedy under a theory of supervisory liability. Officials may not be held liable in a § 1983 action under a simple *respondeat superior* theory of liability. *See Monell*, 436 U.S. at 694. Rather, to be liable, a supervisor must have been personally involved in the alleged constitutional violation or violations. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). A supervisor may be found liable not only by direct participation, but also by "(1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others." *Rolon v. Ward*, 345 F. App'x 608, 611 (2d Cir.

2009) (citing *Hayut v. State Univ. of New York*, 352 F.3d 733 (2d Cir. 2003)); *see also Roberts v. City of New Haven*, 210 F. Supp. 3d 347, 357 (D. Conn. 2016).

The amended complaint conclusorily alleges that Caron, Bisi, Furlong, Davis, and Kennedy were supervisors, that "they directly participated in the action," that they acted with deliberate indifference and gross negligence, that they failed to remedy misconduct after learning about it, and that "they failed to remedy a policy or custom of illegal search, seizure, excessive force, denial of medical care and false arrest." Doc. #43 at 17.

Plaintiffs appear to have abandoned the supervisory liability claims, as they failed to address these claims in their response to defendants' motion for summary judgment. Moreover, plaintiffs have not adduced supporting evidence—either as to these individuals' personal involvement in the alleged constitutional violations or their role as supervisors over Goncalves. The one exception is Furlong. He testified that he supervised Goncalves, and as explained above, plaintiffs have adduced evidence to suggest that Furlong directly participated in the unlawful entry and use of excessive force on August 22. Accordingly, I will grant summary judgment on Count Three as to Caron, Bisi, Davis, and Kennedy, and I will deny summary judgment on Count Three as to Furlong.

### 2. *Claims against Moyer, Verillo, Bachand, and Ritchie*

Defendants move for summary judgment on the claims against Officers Moyer, Verillo, Bachand, and Ritchie, citing lack of personal involvement. Plaintiffs respond that Moyer, Verillo, Bachand, and Ritchie are liable for their "failure to act to stop the violations" on September 5, 2012. Doc. #74 at 4.

Liability for a constitutional violation under 42 U.S.C. § 1983 may be imposed only on government actors who are personally involved in alleged deprivations of constitutional rights.

*See Raspardo v. Carlone*, 770 F.3d 397, 122 (2d Cir. 2014); *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004). As explained above, personal involvement does not necessarily require direct, affirmative participation; a defendant may also be liable for failing to intervene to prevent other officers from violating a plaintiff's constitutional rights.

Plaintiffs have offered no evidence to indicate that Ritchie was present on September 5; it appears that his only involvement in this case was in transporting Martin Conroy to the police department on August 22. *See* Doc. #66-5 at 1. As to Verillo, Bachand, and Moyer, at most plaintiffs have adduced evidence to create a genuine issue of material fact as to whether Verillo, Bachand, and Moyer were present at the scene on September 5, 2012. *See* Doc. #75-20 at 1 (report listing Moyer, Bachand, and Verillo as present); *but see* Docs. #66-4 at 1, #66-6 at 1, #66-22 at 1 (affidavits denying presence). Plaintiffs have presented no evidence, however, to suggest that any of these officers was in a position to have prevented the alleged constitutional violations. An officer's mere presence at the scene is not enough to establish liability for a failure to intervene. *See Gonzalez v. Waterbury Police Dept.*, 199 F. Supp. 3d 616, 623 (D. Conn. 2016) ("in order to proceed under a theory that the defendants . . . failed to intervene in another officer's use of excessive force, a plaintiff must establish, at a minimum, the particular defendant was in a position to intervene" and "an officer may not be held liable if there is a dearth of evidence with respect to whether the officer was in a position to intervene"). I will grant summary judgment in favor of defendants Verillo, Bachand, Moyer, and Ritchie.

### F. Emotional Distress

Counts Five and Six of the amended complaint allege state common law tort claims for intentional infliction of emotional distress and negligent infliction of emotional distress. The standards for these claims are well established as a matter of Connecticut law. For a claim of

intentional infliction of emotional distress, a plaintiff must show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210 (2000). Plaintiffs have not fleshed out this claim in much detail; rather, they claim that "the collaboration by all the defendants by illegally searching, arresting, retaliatin[g] with a tainted search warrant and then a false arrest warrant taken in whole are extreme and outrageous and exceeded the bounds usually tolerated by a decent society." Doc. #74 at 30. Although plaintiffs' claim is relatively thin, I conclude that triable issues of fact exist as to whether Goncalves and Furlong engaged in extreme and outrageous conduct towards plaintiffs, with intent to cause emotional distress, given the facts supporting plaintiffs' excessive force and false arrest claims. The evidence falls short against all other defendants.

For a claim of negligent infliction of emotional distress, a plaintiff must show "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003).

Defendants contend that plaintiffs' negligence claim is foreclosed by the fact that they have alleged that the officers engaged in intentional misconduct. I do not agree, because—as I have previously ruled—this argument ignores the well-established rule that a plaintiff may proceed on inconsistent theories of liability. *See Bussolari v. City of Hartford*, 2016 WL 4272419, at *2–4 (D. Conn. 2016).

35

Defendants further argue that they have governmental immunity from any claims of negligent infliction of emotional distress. Again, I do not agree. A genuine fact issue remains concerning whether the identifiable-person/imminent-harm exception to the government immunity doctrine applies here, at least with respect to defendants' conduct towards Martin on August 22. *See id.* at *4; *see also Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 367 (D. Conn. 2008). Viewing the evidence in the light most favorable to plaintiffs, Martin was clearly identified to Goncalves and Furlong, and both defendants were public officials who knew that their conduct would likely subject him to imminent harm by knocking him down, slamming his head on the concrete, and then kicking and kneeing him. These facts satisfy the test for the identifiable-person/imminent-harm exception to governmental immunity.

Accordingly, I will deny defendants' motion for summary judgment on plaintiffs' claims for intentional and negligent emotional distress as to defendants Goncalves and Furlong. And because plaintiffs' negligent emotional distress claim survives summary judgment, plaintiffs' corresponding municipal liability claims against the Town of Glastonbury pursuant to Conn. Gen. Stat. §§ 52-557 and 7-465 (Counts Nine and Ten of the Complaint) survive as well. *See, e.g.*, *Edwards v. City of Hartford,* 2015 WL 7458501, at *6 (D. Conn. 2015).

### G.  *Assault and Battery*

Finally, Count Eight alleges a state common law claim of assault and battery on behalf of Martin Conroy. "To establish a claim for assault and battery, plaintiff must prove that defendants applied force or violence to [him] and that the application of force or violence was unlawful." *Odom v. Matteo*, 772 F. Supp. 2d 377 (D. Conn. 2011). This claim survives summary judgment for the same reasons that Martin's excessive force claim survives. *See, e.g.*, *Greene v. City of Norwalk*, 2017 WL 1086174, at *10 (D. Conn. 2017).

**CONCLUSION**

For the reasons explained above, defendants' motion for summary judgment is GRANTED in part and DENIED in part. The case will proceed against David Goncalves, Michael Furlong, Matthew Geddes, and the Town of Glastonbury, as to plaintiffs' claims for illegal search and seizure in the garage (Goncalves and Furlong), excessive force (Goncalves, Furlong, and Geddes), false arrest (Goncalves, Furlong, and Geddes), malicious prosecution (Goncalves), assault and battery (Goncalves, Furlong, and Geddes), intentional and negligent infliction of emotional distress (Goncalves and Furlong), and indemnification (Town of Glastonbury). All other claims are dismissed, and the Clerk of Court shall dismiss Chief David Caron, Donald Bisi, Cory Davis, James Kennedy, Steven Moyer, Michael Bachand, Bryan Verillo, and Brandon Ritchie as defendants. The parties shall file their joint trial memorandum on or before October 1, 2017, and the Court shall thereafter set a date for trial.

It is so ordered.

Dated at New Haven this 8th day of August 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge
